Green, Judge,
delivered the opinion of the court:
The plaintiff entered into a contract with the defendant for dredging, transporting, and placing material to be used in the construction of an addition to a levee along the Mississippi River. The price of the work per cubic yard placed was fixed at 35.47 cents and the contract estimate of its amount was approximately $851,280. Excluding the claims which have now been abandoned under the allegations of the petition, the plaintiff seeks to recover approximately $1,022,958.64 for additional work and expense alleged to have been wrongfully caused or required by the defendant in the course of the operations under the contract together with $2,550 deducted as liquidated damages for delay. Included in the recovery asked is an alternative claim for *435 work alleged to have been performed under the contract and not paid for.
As the parties do not agree upon the construction of the contract or upon the facts shown by the evidence it becomes necessary to first construe the contract and then determine what has been proved or disproved by the testimony.
The plaintiff claims that the contract was one for dredging work; the defendant insists it was for levee work. The contract provided in substance that the material should be moved by a hydraulic dredge but it was well understood that the fill which was to be made with the materials moved was to constitute the base of the addition to a levee, except where the material was used to fill old borroAv pits pursuant to the contract. We think that neither party is entirely right with reference to the construction of the contract.
The contract is not as clear as it might have been made and we find it necessary to construe its provisions in the light of all of the circumstances in the case.
The specifications attached to the contract provided that — ■
Alternate bids will be received for placing * * * the required yardage hydraulically in any approved manner.
The contracting officer and counsel for defendant construe the words “in any approved manner” to mean in a manner approved by the contracting officer, but we think it clear that so far as these words taken alone are concerned they can not be so construed. It is not so stated in the words quoted and they would not be so understood as applied to engineering work. The words “approved manner,” when used without other limiting expressions with reference to the performance of the work, we think mean “sanctioned” or “endorsed” generally by those skilled in the business or occupation which is exercised in the performance of the work. This approval need not be unanimous as there is often a difference of opinion in such matters even among those most skilled. In such cases, however, if the practice used is sanctioned by a decided majority or by those shown to be best informed and skilled in the work it becomes established as the “approved method.”
*436 Counsel for defendant in further support of the argument that the approval of the Government engineer was required quotes the following from specification 22 of the contract, which provides—
In the event that the contractor proposes to do the work by hydraulic methods his plan of operation shall be submitted to the contracting officer for approval.
We think that this provision of the contract was abandoned or waived. A plan of operations could not be furnished by the contractor until he received the necessary construction notes and was assigned a borrow pit or pits from which he was to dredge for the fill. No attention seems to have been paid by either party to this provision. No plan was furnished by plaintiff nor was any requested by defendant. The reason appears to be that the work was begun long before complete construction notes necessary for preparing a plan were furnished by defendant and some of the work was begun before any construction notes were available. In fact, defendant advised plaintiff that toe distances could not be given until plaintiff had started pumping and defendant had an opportunity to determine the class of material to be placed in the fill, and further that defendant could not furnish more than 500 feet of construction notes [at one time] which was too short for practical purposes and insufficient for the preparation of a plan of operations. The contracting officer, however, claimed the absolute right to pass finally upon the method used by plaintiff in placing the material and considered that when he determined it was “not proper” this ended the matter. In this respect he erred, but this holding will be found not material to the decision of the case as we proceed with its further consideration.
There is another provision of the contract which defendant claims was violated by plaintiff and was one of the reasons given by defendant for requiring plaintiff to remove a large quantity of material which plaintiff claims had been properly placed in accordance with the contract. Section 22 of the specifications of the contract provides—
No earth showing a tendency to slough shall be placed in the embankment.
*437 The meaning of the word “slough” as given in the dictionary [except where used as a medical term] is to shed or cast off. As thus used it refers to a separation of material. We are unable to apply the clause of the contract quoted above to the conditions under which hydraulic work must necessarily be carried on. The material had to be pumped and it could only be pumped when in a semi-fluid condition, and when discharged it would not only separate but actually flow. Its condition when discharged at the end of the suction pipe was such that this provision could have no application thereto. If this clause has any application, it must refer to the material which had settled and been deposited, but here another difficulty is encountered. What kind of an appearance would be presented by material “showing a tendency to slough” is not disclosed by the testimony. Our determination of other provisions of the contract considered later on is, however, such that a construction of this provision is of no importance.
The contract was not only for moving material but for placing it by hydraulic methods. Moreover, it was stated therein that the earth to be moved was to be used as an embankment for the construction of an addition to a levee. Placing the material in an approved hydraulic manner did not end with its discharge from the suction pipe. It is true that a hydraulic dredge draws into its pipe the material just as it comes. The material to a certain extent is disintegrated and segregated into its component parts by reason of the action of the cutters in the borrow pits and the agitation caused by pumping. (See Finding 14.) This agitation cannot be controlled but the evidence shows that as the material is discharged it is possible to substantially control the placing of it so that the suitable material will be deposited in the fill and the unsuitable material for the most part flow off. Such being the case, we think the contract required that when the material was distributed after it emerged from the discharge pipe it should be so placed by means of settling basins and control of the flowage that any considerable quantity of unsuitable material would not be deposited in one place when intended to be used as part of the base of an enlargement of the levee.
*438 Defendant’s counsel call attention to specification 39.1 wherein it is provided:
* * * in no case shall pockets of water be permitted to remain between the center line of the levee and the outer limits of the hydraulic fill.
This provision had no reference to so-called “ponding” in the settling basins but applied to the finished work after the fill had been made complete.
We have set out our construction of the disputed provisions of the contract in order that they might be applied to the facts established by the evidence. When the plaintiff’s case is analyzed, however, it will be seen that the application of the rulings made above is considerably restricted. The reason for this is that there is no substantial controversy as to the nature of the material which plaintiff placed in the fills forming part of the levee. A portion of it, which defendant required plaintiff to remove as unsatisfactory, is shown to have been unfit for levee purposes by the evidence as a whole. (See Finding 25.) The remainder complied with the contract and was accepted and paid for. The controversy for the most part arises as to whether the restrictions placed by defendant on the flow of material as it came from the discharge pipe caused unnecessary wastage and were arbitrary. In other words, the controversy so far is not whether plaintiff deposited unsuitable material in the fills, but whether defendant, by its requirements and restrictions, caused large quantities of material to be unnecessarily and unreasonably wasted so that plaintiff is entitled to recover therefor as if this material so wasted had been placed in the fills.
The evidence with reference to the alleged wastage of material is extremely indefinite and conflicting. It establishes nothing except, as we have before stated, that the deposit of material in the fills may be largely controlled by the use of settling basins, spillways, baffieboards, etc. The matei'ial which came from the discharge pipe was mixed with water in such a condition that it would flow to a greater or less extent and separate from the water as it flowed. It is a matter of common knowledge that the heavier *439 material in this mixture will first be precipitated; then the next in weight; and last what has been referred to in the testimony as “fines,” that is, fine material consisting mostly of silt. The parties agree that silt in considerable quantities by itself is not suitable for levee purposes and it is evident that there would be more or less wastage if methods were used to prevent an undue accumulation of unsuitable material. The parties dispute as to the number of settling basins which should be used and not only as to the number of baffleboards and spillways but as to the effect thereof. The plaintiff wished to have them so arranged that as much material as possible would be deposited. The result would have been that nearly all the material which was pumped would go into the fills and this would have placed in the fill considerable quantities of unsuitable material. The defendant, through its contracting officer, insisted in some instances on restricting the length of the settling basins to 2,000 feet and also required that the baffleboards should not be used in such a manner as to prevent the continuous flow of water. In some instances, this method resulted in over half of the material pumped being wasted. This would seem to be unnecessary, but how much would be wasted when proper methods were used to prevent unsuitable material being deposited, we cannot determine. Finding 15 shows that when pumping from a certain pit if one long settling basin were used, as plaintiff desired, only 15% would be wasted, but plaintiff’s method, as we have stated above, would have resulted in considerable quantities of unsuitable material being deposited in the fill. We are unable to determine just how much would have been wasted if a proper method, or an “approved” method had been used, for the reason that the evidence fails to disclose any approved method of controlling the placing of the material by settling basins, baffleboards, etc. There is nothing to show any rule or established practice in this matter and it is difficult to see how there could be for the method would be different with the different kinds of material pumped. Plaintiff itself used settling basins shorter than 2,000 feet when pumping material composed largely of sand.
*440 The lack of evidence on this point, however, does not relieve the plaintiff of responsibility if defective material was in fact placed in the levee fills for reasons above stated and ■others that will be hereinafter given.
Taking np next, in their order, the several claims made by plaintiff in its petition, we find that the first claim {paragraph VI of the petition] is for 188,722 cubic yards of material moved on orders received from the contracting officer from the landside toe of the new levee prism to the old borrow pits. Claim 2 [paragraph VII of the petition] goes with No. 1, as it has the same facts as a basis and is for 30,000 cubic yards of material furnished by plaintiff from borrow pit A designated by defendant and which, under defendant’s orders, was removed from the landside toe of the new levee prism to old borrow pits. This material was suitable but had been deposited above the material described in claim 1 and consequently had to be removed if the material referred to in No. 1 was taken out.
In this connection the plaintiff claims that the contract contains a direct provision that it should be paid for the removal of waste material. The provision upon which it relies is set out in paragraph 24 of the specifications and is as follows:
Disposition of objectionable material. — When the borrow pits, or the ground to be occupied by the levee, contain soil which is unfit to be put into or remain under the levee, the contractor will be required to remove the same and dispose of it as directed by the contracting officer. If such material removed from the ground is wasted, the contractor will be paid for it at the contract price per cubic yard.
We think it obvious that this provision pertains only to material in the borrow pits and the ground to be occupied by the levee. In many cases the suitable material in the borrow pits was overlaid with material unfit to be put in the levee. In this event, of course, it was necessary for it to be removed before pumping the suitable material out of the borrow pits. For the removal of material so wasted .the plaintiff was to be paid but this provision has no ap *441 plication to unsuitable or defective matter which, was placed in the fill forming part of the levee.
Defendant’s engineers advised plaintiff that this material was unsatisfactory and ordered its removal. “Unsatisfactory” is not necessarily the same as unsuitable. We do not need, however, to decide whether their action determined the matter, for the evidence pertaining to this particular deposit shows it to be of defective material. (See Finding 25.) Indeed, this is scarcely disputed on the part of the plaintiff. The evidence makes it plain that it was easily distinguishable from the suitable material which plaintiff had placed above. Plaintiff seems to contend that the contract only required that it should pump the material from designated borrow pits and if, when it was discharged, defective material was placed in the fill, it was not responsible. This, we have shown above, is an error, for its responsibility did not end when the material came out of the discharge pipe. Moreover, this is definitely settled by another provision of the contract. Article VI provides:
The Government shall have the right to reject defective material and workmanship or require its correction. ^Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the same from the premises.
The Government had the right under this provision to have the situation corrected and the necessary work done for such purpose and was not required to pay for the placing of this material in the fill, nor on account of its removal, unless some liability was incurred by reason of the material being used to fill the old borrow pits, a matter which will be considered later; or, unless the deposit of defective material came into existence because of unreasonable and unnecessary requirements made by defendant.
Having found that the material was in fact defective, •claims 1 and 2 must be rejected for the reasons above stated, regardless of whether the method prescribed by defendant would have prevented the deposit of defective material or *442 whether this method would have unnecessarily restricted! the deposit of proper material, and we do not pass on these questions.
Claim 3 [paragraph VIII of the petition] is based on an. alleged unnecessary wastage of material pumped from pit A. by reason of defendant’s restrictions on the length of the settling basins to 2,000 feet, and on the use of baffleboards.
Pit A was a buckshot pit in which there was a union of fine sand, silt, and clay. In its natural state it was satisfactory levee material bound together by the clay, but when-mixed with water and drawn through the suction pipe it. was disintegrated and a large amount of unsuitable material which, as it lay in the pit had been bound in with more solid matter, became separated and unfit for use in the construction of the levee. If the material deposited was-restricted to that which was suitable, a large amount of wastage occurred (see finding 14). This is practically conceded by plaintiff but it insists that the defendant’s requirements as to settling basins, baffleboards, etc., caused an excess wastage of 139,985 cubic yards which was entirely unnecessary. It may be, as we are inclined to think, that, the restrictions and requirements made by defendant were excessive but the evidence does not show the amount of wastage which would have occurred if proper methods had been, used — that is, methods which would have prevented the deposit of any considerable quantity of unsuitable material. Finding 14 shows the difficulty which arose when buckshot was pumped and while the evidence in some respects is indefinite it does show, as we think, that a large amount of waste was unavoidable in properly placing this material. On this point the evidence is conflicting, in some respects on both sides we think unreasonable, and from it we are unable to make even an approximation as to the proper-amount. This claim must therefore be rejected.
Claim 4 [paragraph IX of the petition] is based in part on the failure to designate additional borrow pits and defendant’s order to begin placing the materials without retaining levees. We think this claim and claim 5- [paragraph X of the petition] are not proved except as they are merged in claim 6 which will next be considered.
*443 Claim 6 [paragraph Xy3 of the petition] is for filling old. borrow pits on the riverside of the levee and is advanced as an alternative to claims 4 and 5, as the wastage claimed, in 4 and 5 flowed into the old riverside borrow pits. This-claim depends on the construction of the contract, or to state it more definitely, on the construction of a requirement placed in a sketch attached to the contract which will next be considered. The contract included specifications for levee work which were amplified by drawings and sketches-attached thereto and made part thereof, and the work was required to be strictly in accordance with the specifications- and drawings. The contract drawing had a heavy green line as an insignia for the “riverside” work and also a note as follows: “Niverside enlargement to be preceded by hydraulic fill of present pits.” A large portion of the material pumped from pits C and D was wasted. Plaintiff' claims that this waste occurred by reason of the restrictions on the settling basins and removal of the baffleboards under the unreasonable and improper requirements made by the defendant. But there would have been a large amount of waste in any event if only proper materials were permitted, to be deposited in the fill. How much this waste would be, we do not find it necessary to determine because the wastage overflowed into the old borrow pits on the riverside of the levee and plaintiff under the contract would be entitled to-recover to the extent that these borrow pits were filled thereby. It is argued on behalf of defendant that the provision of the contract last above quoted was intended to apply only in case a dry fill was made and hydraulic methods not used. But there is nothing in the evidence which would support this construction. On the contrary it would seem that there may have been no occasion for this-provision if the dry fill method had been used, or at least no more occasion for it. It would seem reasonable that the defendant would not want borrow pits of a size capable of holding such a large amount of material to remain empty on the riverside and adjacent or near the toe of the enlargement of the levee and that the stability of the levee would be increased when these pits were filled with earth. The borrow pits, if empty, would be filled with water when the *444 river was at a high, stage. But we do not base our conclusion on what has just been stated and it is not necessary that we should do so for the contract is quite plain in this respect — indeed much plainer than it is with reference to .most of the matters in controversy. We think the plaintiff was required to fill the borrow pits on the riverside and if we are correct in this it was entitled to pay for the material that went into them.
It is also contended on behalf of defendant that the yard.age for which it was to pay is limited by the estimates contained in the specifications plus 20%, but in Article 1 of the contract the words “more or less” follow directly after the figures stating the yardage to be moved and placed. 'Moreover, we think that taking the contract as a whole it was intended that the plaintiff should be paid for all work done under it. It is also said that a letter from •plaintiff showed it understood that it was not to be paid :for material extending beyond the toe of the levee. But .in the letter plaintiff was writing about the landside enlargement, and we do not think defendant would be willing to have the remainder of the contract construed according to plaintiff’s understanding of it. Elsewhere the defendant is insisting that the contract be constructed strictly against plaintiff.
Another provision of the contract cited on behalf of defendant plainly applies only to cost of clearing, sodding, -etc., and has no application here.
This makes it necessary to determine how much material was thus disposed of. From pit C the plaintiff dredged .1,170,805 cubic yards but the Government accepted only ■237,774 cubic yards in the fill and 111,562 yards as “false ¡berm.” The remainder, amounting to 821,469 cubic yards, -overflowed into the old borrow pits outside of the levee enlargement and false berm. Here no claim can be made -that the material was defective for the purposes for which ■it was used.
From pit D the contractor pumped 493,256 cubic yards • of material for the riverside enlargement. Of this quantity the Government accepted 137,014 cubic yards in the fill and ,5,151 cubic yards outside the prescribed limits of the fill as *445 “false berm.” The remainder, 351,091 cubic yards, went into the old borrow pits and was not paid for by the Government. No spillways were used on this lift and the work proceeded in this manner by common consent. A “false berm” is an additional shoulder of material placed alongside a levee to give it additional stability and foundation and the ■Government paid for what went into the false berms on the ground that the levee was benefited thereby. The total .amount placed in the old borrow pits on the riverside of the levee and not paid for was 1,172,560 cubic yards, which .at the contract price amounts to $415,907,03, which plaintiff 'is entitled to recover.
Claim 7 [paragraph XI1 of the petition] is for 44,444 •cubic yards of effluent materials which went through the .■spillway and were deposited on the foundations of the enlargement below station 1935. Plaintiff concedes that it was necessary to remove the deposit as not being suitable -for foundation purposes but claims that it was caused by the defendant’s interference with the length of basins, height of spillways, and erection of dikes. Here again the •evidence is conflicting. No definite conclusion can be derived from it except that the claim is not supported by a •preponderance of the evidence.
Claims 8 and 9 [paragraphs XII and XIII of the petition] are in the same situation. We are unable to determine from the evidence just how many settling basins would be required for doing the work in approved hydraulic manner and consequently unable to determine whether the •defendant’s engineer acted arbitrarily in requiring additional spillways and additional dikes or, if he ordered more than were necessary, what the proper number would have Vbeen.
Claim 10 [paragraph XIV of the petition] is for the .removal of waste material from “new” borrow pit. This -was done under a separate agreement made by the plaintiff -.that if the particular borrow pit which it wanted was designated it would remove the waste material free of cost. 'Plaintiff claims that this agreement was made under duress, -but the evidence fails to show the necessary elements to .¡constitute duress and the claim must be denied.
*446 Claims 11, 12, and 13 [paragraphs XY, XVI, and XVII of the petition] have been abandoned.
Claim 14 [paragraph XVIII of the petition] for expense of delay caused by failure to make timely designation of borrow pits is not sustained by the evidence.
Claim 15 [paragraph XIX of the petition] for liquidated damages deducted in making payment is also denied as we have found that the delay was the fault of plaintiff.
In accordance with what has been said above, judgment will be rendered for the plaintiff in the sum of $415,907.03..
Whaley, Judge; Williams, Judge; Littleton, Judge; and. Booth, Chief Justice, concur.