*171 MEMORANDUM

Per Curiam:

Pursuant to the order of court new testimony was presented in support of the second motion of defendant for a new trial. This evidence was heard by 'a. commissioner .of this court and he has made his report thereon. The parties to the case, through their respective counsel, .each filed' exceptions to this report, but upon reexamination of the evidence we think it is substantially correct. Tire report shows that the amount of material pumped by the plaintiff which went into the old riverside borrow pits and was not paid for by the Government had been miscalculated upon the testimony originally introduced in the case. Defendant’s motion for a new trial on the ground of a miscalculation has accordingly been sustained insofar as to enter an order correcting the figures stated in the original findings and used in the calculation of the amount of this material. An examination of this order will show that the changes made in the findings do not affect any of the legal questions decided in the original opinion but merely the amount of plaintiff’s recovery under Claim 6 [Paragraph X1/2 of the petition]. It is not therefore necessary to make any change in the opinion except to correct the calculation of the plaintiff’s recovery and the amount of judgment to be rendered. The new Finding 24 shows that the correct amount of ma *172 terial which went into the old riverside borrow pits was 669,647 cubic yards, which at the contract price of 35.47 cents a cubic yard, amounts to $237,523.79. The former judgment has been set aside and a new judgment entered in favor of plaintiff for the amount last stated.
More than thirty days after the filing of the exceptions to the commissioner’s report and after all time had expired for further filings, whether the proceedings were treated as on motion for new trial or under the rules applied to original hearings, defendant’s counsel presented to the court in typewriting a long brief on remand. Some peculiar circumstances not necessary to be recited here have induced us to permit this brief to be filed and, being, filed, it should be and is considered. Part of this last brief is based upon the ground that the actual capacity of the borrow pits was not sufficiently shown by the evidence. It may be conceded that it could not be shown exactly, but this does not prevent plaintiff’s recovery. The commissioner had no difficulty in determining an amount which we think is substantially correct and we have followed his findings although plaintiff’s counsel insists that the amount which he found is much too small and defendant’s counsel insists that it is altogether too large.
The greater portion of defendant’s last brief is devoted to an effort to show that the agents of plaintiff and defendant did not understand that the provision of the contract upon which plaintiff has been granted a recovery was to be carried out; and, assuming that this appears from the testimony, it is contended in effect that the contract is to be treated as if this provision were not a part thereof. Cases are cited in support of the familiar rule that where the terms of a contract are ambiguous or the language of a provision is not plain and is capable of more than one construction, parol testimony may be considered to show the understanding of the parties as to what in fact the contract was between them.But here the language of the contract is clear, definite, and positive. In fact, as we stated in the original opinion, it is much plainer than with reference to most of the matters in controversy in the case. The important part of the provision in question was, as shown in the original opinion, a note attached to the contract drawing, ■ and the contract. *173 itself required the work to be strictly in accordance with the specifications and drawings. It may be that plaintiff’s engineer or agents had not noticed this provision and were not aware of it. Plain agreements in a contract are not to be nullified on account of some oversight or even by a misunderstanding. They can only be taken out by another agreement. The rule which defendant invokes has no application here and on this third argument by defendant our former conclusion is reaffirmed.
The equities of this case are strongly with the plaintiff. By unreasonable and unnecessary requirements on the part of the Government officials the plaintiff was compelled to do far more work than was required by the contract. The defendant has sought to defeat plaintiff’s recovery by every technicality that could possibly be urged and unfortunately the nature of plaintiff’s work was such that it was impossible to show how much more was performed than was necessary. The case has been drawn out to great length by hearing and rehearing until we think no further proceedings should be had except to enter judgment.
FINDINGS AND ORIGINAL OPINION
The findings, amended as shown, together with the original opinion in the case, March 7, 1938, are as follows:
SPECIAL FINDINGS OF FACT
1. Orleans Dredging Company, the plaintiff herein, is a corporation of the State of Louisiana, with its principal office and place of business in the City of New Orleans.
2. On August 22, 1929, plaintiff entered into a contract with the United States, represented by John C. H. Lee, Major, Corps of Engineers, District Engineer, as contracting officer, whereby plaintiff agreed, as the contract recited, to-
* * * furnish all labor and materials, and perform al] work required for the construction of landside enlargement, Stations 1850-1998 and 2085-2190, inclusive, and riverside enlargement; Stations 1998-2065, inclusive, of Beulah to Lake Vermillion levee, on the left *174 bank of the Mississippi River, material to be placed under alternate method as described in paragraph 39.1 of the specifications, subproject item No. 8, requiring about two million four hundred thousand (2,400,000) cubic yards of earthwork, more or less, for the consideration of thirty five and forty seven hundredths (35.47) cents per cubic yard, making a total consideration of approximately eight hundred fifty-one thousand two hundred eighty dollars ($851,280.00), in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows:
Specifications for levee work dated June 22, 1929, numbered 1 to 39.8 and attached hereto. Drawing No. 3 showing the work and method of construction, and two sketches of alternate method, one for riverside enlargement, 60% complete, and one for landside enlargement, 70% complete, also attached hereto.
The contract proAdded that the work was to commence within 20 calendar days after the date of receipt by the contractor of notice to proceed, and be completed withiii 18 calendar months after the said date of receipt. ■
A copj? of the contract is attached to the petition as plaintiff’s exhibit C and is made part hereof by reference.
The “alternate method” required by the contract was described in subproject item No. 8 of paragraph 39.1 as
placing * * * the required yardage hydraulically in. any approved manner, but not necessarily, up- to grade, provided fill is placed on ground cleared of all timber and grubbed of all stumps and for stations 1850-1998 and 2065-2Í90 within the landside toe of the new levee prism and, • for stations 1998-2065, inclusive, within 350 feet riverward from the center line of the existing levee.
Subproject item No. 8 further provided:
In placing the material hydi'aulically, slopes shall be made continuous and away from the levee and in no case shall pockets of water be permitted to remain ber tween the center line of the levee and the outer limits of the hydraulic fill.
Bidders on alternate proposals shall submit sketches and descriptions of method proposed to be followed, including provision for drainage• which shall become part of the contract, if contract is made.
*175 Among other provisions in the contract specifications were the following:
13. Right of way and material. — This agreement is made with the understanding- that the right of way and earth for constructing the levee will be furnished by the United States * * *.
22. * * * In the event that the contractor proposes to do the work by hydraulic methods his plan of operation shall be submitted to the contracting officer for approval.
25. Borrow pits — 'General. — No earth shall be procured from the land side of the levees unless specifically provided for in paragraph 39. The location of borrow pits * * * will be designated by the contracting officer for each section of work advertised, and will be a part of the information furnished prospective bidders. When shown on maps or profiles submitted to bidders that earth cannot be obtained opposite stations it must be hauled from places designated without extra compensation.
. Both parties to the contract employed men who had had some experience in the hydraulic handling of earth; that is to say, the dredging, transportation, and deposit of earth moved by a hydraulic process. But it does not appear that extensive use had been made under varying conditions of hydraulic methods in furnishing a foimdation for a levee. •
The main problem in the work was the placing of the material pumped in the fills so that unsuitable material would not be deposited. It appears that the deposit of material in the fills may be largely controlled by the use of settling basins, spillways, baffleboards, etc., which were used by the plaintiff, sometimes in accordance with directions received from defendant and sometimes contrary to its directions. However, the evidence fails to disclose any approved method of controlling the placing of material by the use of such means. There is nothing in the testimony to show any .rule or established practice in this respect but it does appear that different material required different methods. This was the case particularly with buckshot. The so-called buckshot as it iajr in the borrow pits, to be hereinafter mentioned, was suitable for levee construction, but as shown in a subsequent finding it was so disintegrated in dredging as *176 to present a problem as to how its suitability for levee purposes could be preserved when it was placed in the fill. The Government engineers had been working on this problem but had not solved it at the time the contract work was being done, and the contract specifications did not aid in the determination of how a deposit from buckshot could be placed in the fills in a satisfactory condition for levee purposes after it had been dredged and transported hydraulically.
3. As information furnished prospective bidders the plaintiff in due course had received from the United States Engineer Office at Vicksburg, Miss., by Major John C. H. Lee, District Engineer (the contracting officer) a notice to-contractors dated April 4, 1929, of several projects, to be. undertaken, among them the one here in suit, viz, the Beulah-Vermillion levee enlargement, describing it as located 402 levee miles beloiv Cairo, approximate cubic yards 2,400,000, consisting of landside enlargement Stations 1850-1998, riverside enlargement Stations 1998-2065, and landside enlargement Stations 2065-2190, “all material to be procured along the west banks of Lakes Beulah and Vermillion, by hydraulic methods.”
Up to and including the date of execution of the contract the aforesaid prospective notice to bidders contained the only designation by the contracting officer of the location of borrow pits for the Beulah-Vermillion section, viz, stations 1850 to 2190, and in the contract itself were incorporated all of plaintiff’s plan of operation, sketches, or descriptions of method proposed to be followed, that had been submitted to the contracting officer up to that time.
4. Notice to proceed ivas received by the contractor September 28,1929, thereby fixing the time limit for completion March 28, '1931. Work was commenced about October 10, 3929, in the way of preparatory clearing for the riverside enlargement.
5. The two sketches attached to and made part of the contract show the placement ’ of the fill required. There were first to be constructed comparatively small toe levees at the hypothetical toe of the contemplated new levee, the material for the toe levees to be excavated at the toe of the *177 old (controlling) levee, without disturbing any material in the old levee, the excavation creating a ditch between the toe levee and the old levee. The fill was then to be deposited between the toe levee and the old levee, they acting as retaining walls. Under the hydraulic method of riverside enlargement 60% of the fill was to be within the section or limits of the new levee, and of the landside enlargement, 70%. After the fill had been completed the material so placed by the plaintiff, inclusive of the toe levee, was to be used by the Government for bringing the increased levee to the required grade and section, work that was not included in plaintiff’s contract.
The material to be placed by plaintiff was thus to be partly in and partly outside the section of the new levee, was for levee building purposes, and both parties understood that it had finally to be material suitable for levees, except where it was used to fill old borrow pits pursuant to the contract.
Before dredging and filling could be begun the contractor had to construct in advance a sufficient extent of toe levee to retain a progressing fill. The toe levee could not be constructed until the contractor was furnished so-called “construction notes” by the Government. The construction notes gave the dimensions of the fill, the location of the center line and toe of the new levee, and the yardage to be placed, station by station.
A full plan of operations could not be furnished by the contractor before he received construction notes and was assigned the borrow pit or pits from which he was to dredge material for the fill.
The dredge used on the job, except for a short interval not here material, was a Diesel-powered dredge of 24" pipe capacity, known as the “Diesel,” and efficient. The material was dredged with a revolving cutter and with water forced through the 24" pipe to a point of discharge in a settling basin, between old levee and toe levee, at the far end of which settling basin was raised a crossdike connecting the two levees, short of which there was erected a spillway through the toe levee, of timber, substantial enough and so adapted as to withstand the erosion of water. The spillwav *178 was constructed at the natural ground level and served as an exit for the water coming from the discharge pipe and flowing through the settling basin, and it was necessary that there be placed across it baffle boards in such manner that they could be increased or diminished in height according as the plan was to raise or lower the level in the settling basin. The purpose of the settling basin was to give the earth ejected from the discharge pipe an opportunity to settle, in ■whole or in part, in contract limits, the nature and quantity of the settlement being due to the kind of material, the velocity of flow, and depth of the water. When the water reached the top of the baffle boards, the rate of discharge thereover about equaled the rate of discharge of water from the discharge pipe, and the raising or lowering of the baffle boards determined the quantity of water kept in the basin for settling purposes. An excessive amount of water kept in the settling basin was known as “ponding.”
The full toe levee, built as a retaining wall for the fill in the settling basin, parallel to the existing levee which formed the opposite wall, was on an average about 12 feet high, with a base about 40 feet wide, taking natural slopes, and the ditch from which material was excavated for the toe levee, between location of the toe levee and the toe of the existing levee, was of corresponding cubical dimensions down through the natural surface of the ground.
The spillway having been constructed at the natural ground level, there was formed in the initial discharge into the settling basin, a substantial pond of water, until the rise was sufficient to reach the base of the spillway.
The enlargement of the existing levee from Stations 1850-1998 was known as the upper landside enlargement, being at the northern end of the work and on the landward side of the levee; that from Stations 1998-2065 the riverside enlargement, being riverward of the levee; and Stations 2065-2190, the lower, that is southernmost, landside enlargement. The distance from station to station was 100 feet, making the upper landside enlargement of the existing or controlling levee 14,800 feet, the riverside enlargement 6,700 feet, and the lower landside enlargement 12,500 feet, a total distance of 34,000 feet. 5,000 feet constituted *179 efe s» levee mile, making tbe total distance 6.8 levee miles or .44 statute miles.
6. On October 22, 1929, the contractor made the following written request of the contracting officer:
We enclose herewith map of the Beulah-Vermillion Project, in duplicate, showing the right of way for dredge pits which we request be furnished us.
It is our intention to use the material from the Mississippi River to opposite the spur near Station 2180, in making a part of the landside fill opposite Lake Vermillion, and as the material dredged from this portion of the pit will probably be sufficient to take the fill to a point near station 2150, we would then like tmove up Lake Vermillion and cut into the west bank of the lake at some satisfactory point to get back into the pit. The amount of material which will be dredged in the lower right-of-way will depend on the stage of the river at the time the dredge commences work. Our reason for requesting a large right-of-way around the Beulah Crevasse is so as to enable us to make as large a portion of the fill from the buckshot ridge, which lies on the east side of this crevasse hole, as possible. We hare fownd very good material in Lake Beulah and on the west bank thereof from opposite station 1900 south and desire the right to dig in the Lake on the west shore as conditions may make advisable. The material available in Lake Beulah north, of station 1900 is not desirable, from our point of view, for the fill and we accordingly request the right to obtain material for the fill from station 1850 to 1900 from the pit shown opposite the lower end of piece rmmber semen, as this material is much better for hydraulic filling. This pit will not interfere with the work of the contractor on piece seven as his work on this portion of that contract will doubtless be completed by the time we are ready to dredge from this point.
On account of our experience at Rosedale, we have requested more right-of-way for dredge pits than will be needed to complete the work, so'that we may change our pit location without additional request, in order to ■aviod pockets of undesirable material which will be encountered from time to time. This request will not increase the expense of obtaining the right-of-way as we understand that the Levee Board will obtain this right-of-way with an agreement to pay for only that portion that may be used.
*180 We will appreciate your early action on this request so that the work of clearing this right of way may be started as soon as possible.
This letter not having been replied to, a second request was made by the plaintiff November 9, 1929, concluding as follows: “We * * * would ask that you endeavor to arrange for at least that portion commencing at the river and going along Lake Vermillion, so that we can commence the clearing of that portion during the coming week.”
November 10, 1929, defendant’s area engineer in charge of the work offered the contractor construction notes for 500 linear feet of the job on the lower landside enlargement. For practical purposes 500-foot construction notes were too short, and the contractor objected to them. The offer was limited to 500 feet by the area engineer because defendant’s engineers had not yet come to a conclusion as to the length of settling basins they desired, and wished to prevent the contractor from pumping until that question had been decided.
Plaintiff’s first dragline was moved on to the job about November 11, 1929, at the lower end of the lower landside enlargement.
On November 12,1929, plaintiff communicated by letter to the contracting officer as follows:
Referring to the above contract request is made for a decision by the Contracting Officer as to whether the landside enlargement is to conform to the Class C section as shown on drawing Sheet 3 accompanying specifications Serial No. 29/370, or whether this landside fill shall conform to Par. 19 of the general specifications.
We are ready to commence the building of toe levees necessary before filling can commence, and now have our dragline at Station 2190 waiting for construction notes, before we can proceed. Request has been made of the Area Engineer in charge of the Northern Area at Rosedale, for the necessary construction notes, but he advises that he cannot furnish us with notes until he sees the class of material as it is actually pumped into the fill, and he further states that he cannot then furnish us with notes for more than 500 feet of this land-side enlargement at one time. Our bid on this alternate project was based on the drawings accompanying the specifications, and on other information furnished us previous to the letting by the Area Engineer at that *181 time, that the back slope where the landside enlarge-mént was to be made would be made to the “C” section. We contemplated putting in 70% of the required enlargement inside a back slope of 8 to 1, which would allow us to make our fill with a 12 or 15 to 1 slope which is all the available material will take. Any change making the back slope steeper than 8 to 1 will necessitate that we place our fill with a proportionately steeper slope, which we do not believe possible. Further, if the toe distances on the landside slope are varied from station to station in accordance with the material, the toe levees cannot be constructed in advance and the work then cannot proceed.
We have made arrangements to take care of our drainage through the canals adjacent to the work, and in order that this may be done we feel that we should at least be allowed to construct these toe levees far enough in advance to accomplish this purpose and to insure that the dredge will not be delayed by the lack of toe levees at any time.
For your information we enclose copy of a letter addressed to the Area Engineer at Eosedale. Our drag-line is now idle on the site and we would appreciate your early decision on these matters. Our hydraulic dredge will be ready for filling shortly after December First.
On the same day, to-wit, November 12, 1929, the plaintiff addressed the following letter to the Area Engineer, which is refei’red to in the letter to the contracting officer:
Eeferring to our conversation in your office yesterday at which time request was made that we be furnished with construction notes giving the toe distances and the yardage required on the landside enlargement on the above mentioned project. In view of your statement that toe distances could not be given us until we had started pumping, and you had had an opportunity to determine the class of material to be placed in the fill, and in view of the fact that you feel that at no time can you furnish us with more than 500 feet of construction notes, we feel obligated to refer these matters to the District Engineer for his decision. We regret that such action on our part is necessary.
As explained to you yesterday our bid on this work was based on information contained in Sheet Number 3 of the drawings supplied bidders accompanying specifications serial Number 29/370 and also on information *182 supplied us previous to the letting by the Area Engineer in charge at that time, Mr. W. L. Lipscomb: The drawing mentioned shows that landside enlargement Stations 1850-1998 and Stations 2065-2190 shall be by hydraulic method to the class C section and further indicates that this section was desired by showing typical sections at Stations 1900 and 1975 showing an 8 to 1 back slope. The Area Engineer at that time also informed us that the landside enlargement would be constructed to the C section back slope in verification of this. The back slope required had a great influence on our bid as under the alternate proposal we cannot be paid for material beyond the toe of the theoretical enlargement. Had we been given to understand at the time of the letting that it was contemplated to vary the slope on this landside enlargement we would probably not have submitted a bid on the project. We_ are of the opinion that in this case the general specifications Par. 19 do not apply and that the special specifications as indicated on the drawings made a part of the. contract should govern. We now are ready to start constructing the toe levee for the landside fill commencing at Station 2190 and shall hold the United States responsible from this date for delay to the prosecution of this contract until construction notes are furnished us so that we may construct this levee which is a necessary preliminary before filling can commence. We cannot make this fill in 500 foot sections as this will not allow us to take care of our waste water. For your information we intend taking care of this water by using the drains which take off from the landside pits at various points, and we have obtained permission from the drainage boards to use their canals for this purpose. In order to properly care for this water it is necessary that we be allowed to construct sufficient toe levee to guide the flow of water to these drainage canals. Further from the yardage required from Station 2190 to 2182, which has been computed in your office, 500 feet of toe levee will allow us to operate our dredge only about 24 hours before we would be required to shut down to wait for the dragline to construct another 500 feet. We feel sure that you have not taken into consideration the type of plant to be used on this work in contemplating such a limit, as you are of course aware that a 24" hydraulic dredge cannot operate under such conditions.
It is our desire to carry on this work in a manner thoroughly satisfactory to you and the District Engi *183 neer, but we cannot obviously do so if conditions such as these are imposed.
We are today addressing the District Engineer asking for a decision on these matters, and are sending him a copy of this letter. Our dragline is now at Station 2190 waiting for .the construction notes requested, and we beg to notify you that we are being delayed by causes beyond our control, and that we shall expect the time we are delayed to be added to our contract.time.
On November 13, 1929, the contracting officer advised plaintiff that immediate steps were “being taken to condemn the necessary right of way.”
• 7. The contractor found that, due to a rise in the Mississippi River about the middle of November 1929, he would soon be able to move his dredge into Lake Beulah, at the north end of the work, and so he decided to commence operations at Station 1850 southward, instead of at Station 2190 northward, as he had originally planned. He immediately began tracking his dragline from the lower to the upper end of the project.
8. It was necessary for the contractor to have more than 500 feet of construction notes, in order that he might be able to build a settling basin of practical dimensions: The contract was silent on the length of settling basins. Defendant’s engineers claimed the right to restrict the contractor as to length, and the contractor claimed that under the contract the matter of length was within his own discretion. A conference was held between representatives of defendant..and a representative of plaintiff November 19, 1929, at which it Avas determined by defendant’s officers that on the upper landside enlargement the settling basins should not exceed 2,000 feet, and this determination was acquiesced in by the contractor. Prior to the arrival- of the dredge the contracting officer would not permit the contractor to construct an indefinite length of full toe levee, for the reason that high water was impending, and the ditch at the land-side toe of the old levee, created by excavation of material for the-toe levee, -would endanger the integrity of the old levee. Had the dredge been ready to operate it could-have quickly refilled the ditch if the necessity had arisen.
- The dragline, tracked from the lower end of the project, arrived at the upper end November 28, 1929, and was then. *184 ■and there available for the construction of the toe levee. On that date the area engineer caused to be given to the contractor 4,000 feet of construction notes, southward from Station 1850, and the contractor was by him then authorized to construct a full toe levee, some 12 feet high, for a distance of 2,300 feet, 300 feet over the permitted 2,000 feet of a settling basin, and .1,700 feet of partial toe levee, 5 feet high, with full base, down to Station 1890, which the contractor did before he commenced pumping operations.
9. One of the pits requested in the contractor’s letter of October 22, 1929, Finding 6, described therein as “the pit shown opposite the lower end of piece number seven,” was afterwards known as Pit A. The material therein was predominantly buckshot and was considered very desirable material by the defendant. The Board of Mississippi Levee Commissioners acquired Pit A December 11, 1929, for use on the Beulah-Vermillion levee enlargement. Pit A was thereafter designated by the contracting officer for use on the upper landside enlargement and the material therein furnished the contractor by the United States by the time plaintiff was prepared to begin dredging operations.
10. On December 20, 1929, the contractor requested a change in the contract, permitting him to conduct operations on the lower landside enlargement by means of a clamr shell dredger, taking material from the west side of Lake Vermillion and rehandling over the main levee, in lieu of an hydraulic dredger, the contractor representing that the material there was not satisfactory for hydraulic handling, that the separation that takes place in pumping would be avoided, that more than the contract 70% would thereby be left in place, that the clamshell dredger could be working during the same period as the hydraulic dredger thus advancing completion, and giving other reasons.
On January 13, 1930, the contracting officer consented to the change under certain conditions, which were not accepted by the contractor, and the change was not made.
11. About the middle of January 1930, before he commenced pumping operations, the contractor was given additional construction notes for the upper landside enlargement from Station 1890 to Station 1998, but was given *185 permission at that time to build only'a partial toe levee, o feet high, from Station 1890 to Station 1998, the reason being that a foil ditch incident to a full toe levee would have endangered the old levee. A five-foot toe-levee was not high enough to retain the fill in a settling basin, and its sole purpose for the time being was to prevent overflow' of the foundations below the settling'basin that was then being filled up. The specifications required the foundations to “be thoroughly broken and'turned to a depth of 6 inches.” Overflow of the foundations by the effluent from the settling basin would deposit 'material and so wet and foul the. foundations as to make the preparation thereof slow and difficult. The small toe levee, first erected,' wás-to be left in place, and merely added to to bring it up to foil height of around 12 feet.
The effluent from the settling basins at the upper end of the work flowed first into old borrow pits (which extended the full length of the upper landside work, viz, from Stations 1850 to 1998), where it settled again and then drained into Clear Creek drainage district. The old borrow pits were turned into settling basins by the contractor, erecting a small dam at their outlet for that purpose, this being necessary to prevent clogging up the-ditches in the drainage district with material not retained in the fill. The building of this dam caused water to back over the foundation below Station 1935, as will hereinafter be further described. The contractor built other dams or dikes-outside the borrow pits to-prevent overflow of farm land.
12. Plaintiff’s dredge, the “Diesel,” arrived at the site of the work January 12, 1930. It was placed in Pit A, connected up with the pipe system to -the first settling basin, Stations 1850 to 1810, and started pumping January 28, 1930.
The end of the discharge pipe was first placed at Station 1850 or thereabouts, and was thereafter • advanced and set back from time to time as conditions required.
The spillway was closed and the crossdike cut at Station 1870 February 23, 1930, with the end of the discharge pipe .-at or near Station 1857, 1,300 feet back from the crossdike at Station 1870, and 3,300 feet distant from the crossdike, *186 at Station 1890. The discharge pipe had previously progressed to about Station 1866, 400 feet distant from the then intact crossdike and spillway at Station 1870, and was on February 23, 1930, used in making a second lift, that is. depositing levee material over that already deposited to-bring it up to the agreed section.
The second settling basin extended from Station 1870 to' Station 1890, and the crossdike was breached and the spillway closed at Station 1890 March 15, 1930, with the end of the discharge pipe at or near Station 1866, 2,400 feet distant from Station 1890, and 3,900 feet distant from the spillway and crossdike at the end of the next settling basin at Station 1905. The end of the discharge pipe had previously been advanced to Station 1875, and brought back for a second lift.
On-March 15, 1930, the effluent from the spillway began to overflow the foundations of the enlargement principally from Stations 1935 to 1976, due to failure of the contractor tp build sufficient partial toe levee in advance to prevent the backing up over the foundations of effluent unable sooner to find an exit into the drainage system through the old borrow pits dammed up as described in Finding 11.
13. On March 9, 1930, at a time when the dredge “Diesel”’ was not pumping, the defendant’s chief of operations in charge of the work, Major T. B. Larkin, defendant’s area engineer, Edgar S. Maupin, and its inspector, William J. New, inspected the fill, and found below, that is, south of Station 1882, a small deposit of silt. Area Engineer Maupin attributed the deposit of silt to high placing of baffle boards in the spillway and a consequent ponding- of water in the-section, allowing silt to deposit instead of discharge through the spillway. On that date, March 9, 1930, he communicated with the contractor by letter as follows:
Orleans Dredging Co.,
- Leyser Bldg., Greenville, Miss.
In Person to Captain Cole,
Representative, Beuíah-Vermillion Contract.
Gentlemen :
You are hereby directed to remove baffle boards from the spillways at the ends of your 2000' settling basins-on the Beulah-Vermillion contract.
*187 The reason for this is to prevent the formation of silt pockets and give a free and unrestricted flow of runoff water from the several settling basins.
Very truly yours,
(Signed) Edgar S. Matjpin,
Edgar S. Maupin,

Senior.. Engineer.

cc to District Engineer, Vicksburg Engineer District,. Vicksburg, Miss.
March 11, 1980, the plaintiff replied to this order as follows:
Replying to your letter dated March 9, 1930, addressed to this company and delivered to Captain Cole on the Beulah-Vermillion Contract, directing that the gates in our spillways be removed due to your feeling that the use of these gates will cause the formation of silt pockets.
We respectfully decline to remove these gates as you have directed, as the use of these gates is necessary in our opinion, both to retain material in the limits of the fill and as a means of preventing damage to. private interests. These gates will not cause the formation of silt pockets in the final fill. Furthermore your order will interfere with the detailed method of operation on this contract and therefore exceeds the rights granted the United States by the contract and specifications.
Referring to the statement made by you yesterday that you would withhold any estimates due us until the directions referred to are carried out, it is our opinion that such action cannot properly be taken. We are not violating in any manner the contract, or the specifications. We are, as you know, placing material in the limits of the fill by the method prescribed in the contract from a borrow pit furnished us by the United States, in the event that by reason of the use of the. method prescribed some of the material furnished us becomes objectionable to the Contracting Officer after being placed in the fill, we shall be glad to waste' this material in accord with paragraph 24 of the general specifications, at the contract price per cubic yard if directed by him to do so. The runoff water from our operations now has a free and unrestricted flow, the gates in use merely serving to retain a part of the material that would otherwise escape through the spillway in such a short settling basin.
*188 To this letter the contracting officer responded by wire March 12, 1930, as follows: ■
Area engineer advises that you refuse to remove baffle board from spillway of your exit for discharge of waste water on your Beulah-lake Vermillion contract, thereby pocketing water between the center line of levee and outer limits of hydraulic fill stop as this is violation of spécifications no payments will be made..
There ensued other correspondence between the contractor and the contracting officer, or his representative, with reference to operations on the upper landside enlargement. Therein the contractor maintained that removal of the baffle boards would cause excessive loss of material and the material so lost would injure the neighboring drainage systems, and that any unsatisfactory material would be gladly removed at the contracting officer’s direction. The contracting officer, on the other hand, maintained that under the contract the contractor was required to deliver-satisfactory material at the site of the enlargement; that the material then being there deposited was unsatisfactory; that the plan of operations was subject to the approval of the contracting officer; that the method of operation employed by the contractor deposited silt, which was unsatisfactory because it would not support other material and would slough. In a letter to the contractor March 31,1930, he concluded :
I am of the -opinion that this material in question is unsatisfactory and will slough. Therefore, I cannot authorize any payment for this doubtful material.
The material in the borrow pit is known to be satisfactory material. _ The only way in which such material can become unsatisfactory is due to the method of placing. Your method, of placing, under paragraph. 22 of the specifications is necessarily subject to the approval of the contracting officer. This authority is being invoked only when necessary to guarantee the fulfillment of the contract, namely, to provide essential material for levee protection and to safeguard the interests of the people and lands lying behind the levee.
14. The order to remove baffle boards from the spillways was not obeyed by the contractor. He endeavored to and *189 did, while operating from Pit A, retain in the fill all the material that he could, keeping the flow through the spillways as clear as he could.
The buckshot as it lay in Pit A was a union of fine sand, silt, and clay. In its natural state it was satisfactory levee material and was bound together by the-clay. Sufficiently agitated in water, the buckshot would separate into its three elements, and once separated they could not again be so brought together in the fill as to bind and form satisfactory material for levee construction. .
The material as it came out of the discharge pipe was ■comprised of water, fine sand, silt, clay, and solid buckshot. The solid, or undisintegrated buckshot, came out in lumps of various sizes, and settled close to the end of the discharge pipe. When -dried, it formed satisfactory material ; when wet it was slippery and showed a tendency to slide. The fine sand was carried, on a little farther, then the silt was deposited and little or no clay in suspension was retained in the fill.
Homogeneity of material in the fill, that is to say, uniform distribution of the various elements (exclusive of water) coming from the discharge pipe, is.best attained by .uniformity of flow and maintenance of a constant distance from end of the discharge pipe to the outlet of. the settling basin.
In pumping from Pit A the contractor’s object was to retain in the fill all the material (aside from water) that he had pumped from the pit; the endeavor of the contracting •officer and his representatives was to have expelled from the settling basin, before it had a chance to settle, all the silt and clay that had in the process of agitation become separated ■out of the buckshot. It was not possible in the process to reunite the binding element, clay, with the other parts of the buckshot and it "was carried out as effluent' material. There resulted a deposit of silt, substantially unmixed with other elements, in the fill from Station 1882 southward on the upper landside enlargement.
Silt did, in fact, in the upper landside enlargement, support buckshot superimposed upon it and by the method of •operation used there were left in the upper landside en *190 largement fill sections or areas of silt surrounded, or covered up by other material.
A substantial aggregation of silt endangers the integrity of a levee and is unsuitable. When exposed to the action of water it is easily eroded.
The evidence is not satisfactory .as to Avhether it was'necessary to remove the -baffleboards from the spillways and permit a free and unobstructed flow of runoff water from one or more of the settling basins in order to prevent the' formation of silt pockets or deposit of the material classified by the contracting officer, as hereinafter related, as objectionable.
15. The third, fourth, and fifth settling basins on the upper landside enlargement were each 1,500 feet in length, a length less than the required 2,000 feet and chosen by the contractor for his own convenience.
The third settling basin extended from Station 1890 to Station 1905 and the spillway was closed and crossdike-breached at Station 1905 April 1, 1930, when the end of the-discharge pipe was at or near Station 1888, 1,700 feet back from the crossdike and spillway at Station 1905, and 3,200' feet from Station 1920.
The fourth settling basin was from Station 1905 to Station 1920 and the spillway was closed and crossdike cut at Station 1920 April 23, 1930, with the end of the discharge pipe at or near Station 1899, 2,100 feet from Station 1920; and 3,600 feet from Station 1935. •
The fifth settling basin extended from Station 1920 to Station 1935, and the spillway and crossdike at Station 1935 were used intact up to April 26, 1930, at which time the end of the discharge pipe was at or near Station 1906+60, 1,340 feet distant from Station 1920, and 2,840 feet from Station-1935.
At that time, April 26, 1930, the dredge “Diesel” ceased pumping from Pit A, material there that was available having been for practical purposes exhausted.
In all, the contractor pumped from Pit A 621,131 cubic yards of material, 210,422 cubic yards of which were accepted by the Government in the fill, 138,722 cubic yards of which were rejected in the fill as unsuitable, and 38,832 cubic *191 yards of which were also rejected because superimposed upon the unsuitable material (as will hereinafter appear), representing a wastage through the spillways of 233,155 •cubic yards, or 37.5%, -in .the process of dredging from Pit A.
If the contractor had so adjusted the baffle boards as to waste also the rejected 138,722 cubic yards through the •spillways, the wastage therethrough would have been 371,877 •cubic yards, or 59.9%.
If the contractor had used on the upper landside en-< largement, Stations 1850-1998, one settling basin only, with •one spillway, the wastage would have been about 93,170 •cubic yards, or 15%.
16. Theretofore, on April 1,1930, the contractor communi•cated with the contracting officer by letter as follows:
We will exhaust the present borrow pit at- Beulah Vermillion in the next few days. We enclose here-Avith a drawing showing the location of another pit which Avill be necessary so that we can complete the upper portion of the landslide enlargement adjoining Lake Beulah.
The material in this pit is a good grade of sand overlaid with soft clay or buckshot.
We request that this new pit be furnished as quickly as possible and Avill appreciate your immediate attention.
The borroAv pit thus requested was on the northern bank •of Lake Beulah and extended from, opposite Station 1850 ■to opposite Station 1975. This .request the contracting •officer by letter of April 7, 1930 refused, on the ground that the pit contained a large percentage of unsatisfactory .material, and suggested that there might be satisfactory material on the south bank of Lake Beulah at about Station 1900.
On April 10,1930, the contracting officer by letter ordered the contractor to prepare properly the foundations that had "been overflowed with the muck from the spillways by re--moA-ing the deposit and breaking the ground as required by ’the specifications.
From the refusal of the contracting officer to furnish the ’borrow pit requested in the contractor’s letter of April 1, *192 1930, the contractor on April 13, 1930, appealed to the president of the Mississippi River Commission, Brigadier General T. H. Jackson, who gave his decision to the contractor April 19, 1930, by wire as follows:
Reference to telegraphic appeal and decision of" Major Lee comma inspection by myself on eighth and by member of -my staff since indicates it is undesirable-to open borrow pits on west [north] bank of Lake-Beulah for use in extension of present work until levee-foundation is properly prepared in accordance with paragraph twenty of specifications stop this preparation is impossible at the present time on account of condition of the right of way created by your method' of work stop in order to allow you time for preparation of this foundation in accordance with paragraph twenty and to prevent delay to your work district • engineer has been directed to furnish the borrow pits for use-along lower portion of your contract stop he has also-been directed te prescribe under paragraph seventeen of specifications that on exhaustion of your present borrow pit that you commence work in vicinity of station one nine nine eight stop this action will prevent both delay and expense to you stop the question of detail location of borrow on west [north] bank of Lake-Beulah will be taken up later stop in connection with this general subject my inspection on eighth showed deliberate violation of specifications by your local engineer in the ponding of water stop it is suggested that you give this matter careful consideration as continuation of this policy is certain to lead to delay in completion of the work which is undesirable both to your company and the Government.
' On April 21, 1930, by direction of the contracting officer,, the contractor was orally assigned to the use of Borrow Pits C and D, located as hereinafter described.
On April 22,1930, the contracting officer ordered the contractor to work north or south from the vicinity of Station 1998. Work north thereof was on the upper landside enlargement; south thereof on the riverside enlargement.
On April 25, 1930, the contractor, after describing his plan of operations in the vicinity of Station 1998, which disclosed his purpose to dredge to the riverside fill south of Station 1998 simultaneously with preparation of founda *193 tions and erection of toe levee on the uncompleted upper landside enlargement north thereof, requested of the contracting officer a pit on the northern bank of Lake Beulah opposite Stations 1850 to about 1925 for use on the uncompleted portion of the upper landside enlargement. The-request for this pit was not granted.
17. The contractor moved the dredge “Diesel” into Pit D April 80, 1980, by cutting a channel. Pit D was located alongside the riverside enlargement, riverward, from Station 2000 to about Station 2065, and contained material similar to that in Pit A. The contractor could not fill northward from Station 1998 at that time, April 30, 1930, due to the fact that the foundations north of Station 1976 had been fouled and not yet prepared, and there were no toe levees yet constructed for some distance north of Station 1998.
Toe levees were not used by the contractor for the first lift on the riverside enlargement, because of the physical conditions.
Old borrow pits ran alongside the site of the riverside fill, and the contractor pumped against the face of the old levee, allowing the material to run into the borrow pits until it created a “false berm” between borrow pit and levee and gave sufficient base for a toe levee which he built later on for his second lift. The first lift, a blanket fill, was made from Pit D, and operations therefrom began May 1,. 1930, and ceased June 12, 1930. The dredge “Diesel” was shut down June 12, 1930, and did not resume operations until it was removed to Pit C and operated therefrom beginning October 6, 1930. The period of this delay, June 12, 1930, to October 6, 1930, is chargeable to the neglect of the contractor to proceed with the work. The contractor did no corrective work on the upper landside enlargement from about the first of May to the middle of June 1930.
Prem Pit © the eentraetor pumped 4037250 eubie yards el-yn Q-h a_ 1. -f t h o mtc hd itux rur T?x£t? Stations 490S-30€5x Of this quantity the Government aeeepted 43?tQ44 eubie-yards in the fill and 5y454 eubie yards eutside the prescribed-limits of the fill as --false berm-P The eubie yardsy remained in the eld berrew pits and was net paid fer by the Gevernmenti This method el dredging Irena- *194 -Pit D te the riverside onlargomonty with consequent ever--Sow ef &51;091 eubte yards inte the eid berrew pits-? was meeti Ne spillways were «sed en tibie üfti The Govern--mend paid fer tibe -5yl-51- eubic yards ef iifalse be?jm~ en the •greaad that the levee was benefited thereby aad that it was preper that the eeatraeter sbeald be paid therefor? False berm is aa additional should or e# material plaeed artificially alongside the levee ia erder te give it additional stability
Article 1 of the contract provides that the contract shall be performed “in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof” and in Article 2 that “anything * * * shown on the drawings and not mentioned in the specifications shall be of like effect as if shown or mentioned in both.” Article 1 also referred to sketches for riverside and landside enlargement attached to the contract. The contract drawing in a “legend” to the left opposite a green line insignia on the drawing for “riverside” work has this note: .
Riverside enlargement to be preceded by hydraulic fill of present pits.
In this manner the contract located the riverside work and provided what should be done with the pits which the ■evidence shows were close to the toe of the addition to the levee.
18. On May 21, 1930, while the contractor was pumping buckshot from Pit D on the riverside enlargement, he requested of the area engineer that he obtain for use on the levee enlargement a buckshot pit of comparatively small extent about opposite Station 2000, in addition to larger pits adjoining, already condemned for use on the work.
19. The contractor removed the effluent from the levee foundations, accumulated there as hereinabove described, below Station 1935, commencing the removal June 12, 1930, and completing the same June 30, 1930, using dragline, scraper, and other dry-land equipment. The cost of removal was approximately $3,685.11. The amount removed was 44,444 cubic yards.
*195 20. On June 14,1930, a conference was held between representatives of both sides at the office of the Chief of Engineers, U. S. Army, in Washington, D. C., Maj. Gen. Lytle-Brown, for the purpose of adjusting disputes that had arisenj between them. At this conference, the Chief of Engineers ruled that material placed by the contractor from Stations 1882 to 1935 from Pit A, and theretofore objected-to by the contracting officer as material not suitable for levee construction, due to the method of transporting from- Pit A and placing in the settling basins, would have tó be removed by the contractor and at the contractor’s expense. The preparation of foundations theretofore also-objected to, was conceded by the Government representatives as acceptable.
21. On June 24,1930, the contractor made a written request of- the contracting officer for an indeterminate extension of time for performance, due to delay then being experienced on account of certain actions of the Government complained of, in the nature of interference with the contractor’s mode of operation, chiefly, the limitation of settling basins and resultant deposit of muck over fundations, and enforced removal to Pit D before the upper landside fill had been completed.
The contracting officer refused the request and on June 30, 1930, so notified the contractor.- .From this refusal the contractor on July 30, 1930, appealed to the president of the Mississippi Elver Commission, who on August 16, 1930, refused to entertain the appeal on the ground that he had no authority to do so.
22. On June 24, 1930, the contractor requested of the contracting officer that he designate the exact locality of the unsuitable material from Stations 1882 to 1935 which General Brown in the conference of June 14, 1930, had ruled must come out at the contractor’s expense, give directions for its disposal, and furnish information as to location of pits for the remaining work on the upper landside enlargement extending from Station 1876 to Station 1998.
July 5, 1930, the contracting officer notified the contractor that a satisfactory disposition of the unsuitable material *196 would be on the landside in the old borrow pits not closer than five feet to the landside toe of the new enlargement, and gave the detailed extent and location of the unsuitable material between Stations 1882 and 1985, amounting approximately to 138,000 cubic yards.
July 7, 1930, the contracting officer in writing furnished the contractor with the location of borrow pits satisfactory to him for the contract work. The locations shown were severally designated borrow pits “A,” “B,” “C,” “D,” and “E.” The locations of borrow pits A and D were as herein-above indicated and had already been used. Borrow pit B was on the south bank of Lake Beulah opposite Stations 1883 to 1906, and was never used; borrow pit C was on the south bank of Lake Beulah near Station 1991; and borrow pit E ran along the western bank.of Lake Yermillion opposite the lower landside enlargement site, Stations 2065 to 2190.
Pit B was substantially the pit referred to by the contracting officer in his letter to the contractor dated April 7, 1930, as possibly containing satisfactory material. Pits A, B, C, D, and E were all buckshot pits.
On July 24, 1930, the contractor stated his objections to Borrow Pits A, B, C, and D, and made no mention of Borrow Pit E.
The principal objections by the contractor were the great waste from buckshot pits required by the contracting officer’s definition of unsatisfactory material, the difficulties of flotation of the dredge “Diesel,” and there was an additional objection made to the use of Pit A on account of its substantial exhaustion.
On August 1, 1930, the contracting' officer by letter to the 'contractor denied the validity of all these objections.
23. The contractor not having removed the unsuitable material directed by the Chief of Engineers to be removed on the upper landside enlargement between Stations 1882 and 1935, the contracting officer, on September 25, 1930, by letter to the contractor again ordered its removal.
The contractor, October 3, 1930, replied to this order as follows:
*197 Replying to your letter of September 25, 1930, relative to removal of material between Stations 1882 and 1935; also regarding our resumption of work.
It is our purpose to begin pumping in material near Station 1998 within the next five (5) days; that is, as soon as pipeline can be laid. This material to be taken from borrow pit “C” as designated by you. This work will be prosecuted toward Station 2065, with spillways 2,000' apart.
While the above-mentioned work is being done (between Stations 1998 and 2065) we will be installing the pipeline from the new pit recently selected on the Island (approximately opposite the work between Stations 1882 and 1935), from which latter pit we propose to pump in the landside enlargement between Stations 1882 and 1935. We understand that the material in this latter pit consists of coarse sand and will require only one spillway.
It is also suggested, subject to your approval, that the removal of the 138,000 cubic yards of objectionable material (between Stations 1882' and 1935) be accomplished by washing same out with the discharge from the pump. This removal is to be done by using the booster plant for this purpose. The spillway for wasting this material to be located through the controlling levee so that this unsuitable material can be wasted into Lake Beulah.
It is understood that in using this latter borrow pit it will be necessary to strip the overburden of unsuitable material to a depth of approximately nine (9) feet; that is, until suitable sand is reached and flotation for the dredge is obtained. This latter material (stripping) to be wasted into Lake Beulah.
Hoping the above meets with your approval, we are, etc.
The pit referred to in this reply as approximately opposite work between Stations 1882 and 1935 was a sand pit, on the northern bank of Lake Beulah, and was known as Pit 2-A.
24. From Pit D the contractor moved his dredge “Diesel” to Pit C, and started pumping therefrom about October 6, 1930, into the riverside fill, over the blanket laid down by the dredging operations from Pit D. For the second operation a toe levee was used, erected atop the blanket fill, from *198 Stations 2000 to 2020. The riverside fill was completed', from Pit C.
From Pit G the eentraeter dredged -1-1-7Qt80£ eafeie yards-for the riverside e&tegementy ef -whieh the Geyeeameat-aeeepted 287j7--7-4 éufeie yards ha the fiH? and -l-l-ly&fiS eahie-yards as -daise berm-. -’ The remainder earae te rest in the-eld berrew pitsj eatside the limits ef the levee enlargement-■ and ---false berny21 araeantieg te 834j40fi enhie yards7 and was net paid ferr As stated ha Finding Afj this was a-reasenafele procedure te whieh the defendant made ne- /-» -hi TJ Uj UC U1UJ.J.V
The aggregate of 1,172,560 cubic yards of material" pumped from Pits C and D was not accepted by the Government either as fill or. as false berm, and 669,647 cubic-yards thereof went into old riverside borrow pits that were-, used in the construction, restoration, or enlargement of the old cut-off levee between Stations 1998 and 2067 before-the commencement of any work by the plaintiff herein. The remainder, 502,913 cubic yards went into more distant borrow pits or other depressions whose connection with the-cut-off levee or reasonable proximity thereto is not established, or was otherwise dissipated, and its allocation to-these several destinations does not appear. The plaintiff has not been paid for the material which went into the-old riverside borrow pits as above stated.
25» The material from Stations 1882 to 1935, objected to by defendant’s officers, was so doubtful in nature as to justify its classification as unsuitable for levee construction. The-contractor had pumped thereover a quantity of suitable material, and in the process of removal the suitable material necessarily had to be removed also, some small portion of if being thereafter replaced. This material, both suitable- and unsuitable, was not washed out as suggested in the contractor’s letter of October 3, 1930, but was removed by the* contractor by the so-called dryland method, in this instance-by the use in the main of draglines, the work being accomplished from September 1930 to May 1931.
The unsuitable material consisted of 138,722 cubic yards and the overlying suitable material,.38,832 cubic yards. For-placement and removal of this total of 177,554 cubic yards- *199 the contractor was paid nothing. The approximate cost to him of removal was $48,332.73.
26. Pit 2-A was a sand pit, overlaid with material which was not suitable for levee construction and which had to be wasted. The contracting officer January 31,1931, communicated with the contractor regarding this borrow pit as follows:
There is enclosed herewith a blueprint showing pits which are designated on the west [north] bank of Lake Beulah, for use in the construction of the levee between stations 1876 and 2000 on your Beulah-Lake Vermillion contract. Material to be removed and wasted before any material from pits is used in the levee is also shown by sections on the blueprint.
The wasting of this overburden involves the handling of approximately 459,000 cubic yards of material which will be paid for at contract price per cubic yard.
The contractor moved his dredge to Pit 2-A about February 7, 1931. The overburden thereof was accordingly stripped and wasted by the contractor and the remainder of the work on the upper landside enlargement completed hydraulically with sand from' Pit 2-A, including the replacement of 138,722 cubic yards removed as described in Finding 23, and the greater part of the 38,832 cubic yards of satisfactory material superimposed.
From Pit 2-A the contractor' stripped and wasted an overburden of 499,836 cubic yards, for which the Government paid, and dredged into the fill 821,229 cubic yards thereunder, for which-the'Government also paid the contractor.
27. On May 15, 1931, the contractor communicated with the contracting officer by letter as follows:
_ We expect to finish pumping from the present borrow pit (No. 2 — about opposite Station 1900), about May 25th, 1931.
In order to complete the landside enlargement from Station 2065 to Station 2190, it will be necessary to locate and use another pit.
I am advised that explorations and borings show a pit with suitable material, located along the west [north] shore of Lake Beulah, about 5,000 feet southwards of the present pit (No. 2), that is, about opposite
*200 Station 2000, and about 1,500 feet westward of the east shore line of Lake Beulah.
I am also advised that some stripping of unsuitable material will be required.
You will recall that we attempted recently, with the Dredge Houston, to use the pit on the west side of the Mississippi River to make this landside enlargement, but after pumping some fifty to sixty thousand yards, we were compelled to discontinue this operation on account of the drift and current breaking up our pipe line.
On account of the short time remaining to _ make the above described change, we would appreciate your prompt reply and instructions regarding above matters.
We have permission from the owners to use the above-described pit.
The pit described in this communication as about opposite Station 2000 came to be designated Pit A-C. It was a sand pit and, except for 58,602 cubic yards taken from the Mississippi River by another dredge, an operation found to be impracticable, furnished all the fill on the lower landside enlargement.
The contracting officer’s representative on May 20, 1931, replied:
The pits originally designated for this work were on the west bank of Lake Vermillion and are still available. However, should the desired new pit on the west [north] bank of Lake Beulah contain suitable material, it will Be approved by this office, provided that all objectionable material be stripped from same without cost to the United States.
On receipt of your agreement to the above the necessary borrow pits will be • investigated and designated-
To this the contractor responded May 23, 1931, that:
(1) The only pits which we are aware of that contain material which conforms to the contract and specifications, that is, “75% or more sand,” for the land-side Enlargement (Station 2065 to Station 2190), are the pits on the west [north] side of Lake Beulah, as-previously suggested in our letter of May 15th.
(2) Our past experience in “placing hydraulically” the material found in pits “A,” “G.” and “D,” which material in the pits is similar to the material found' along the west bank of Lake Vermillion, indicates to. *201 us that if we attempted to “place hydraulically” this Lake Vermillion material, that your office will reject 65% to 70% of same after being so placed.
(3) If you know of any pits on the west side of Lake Vermillion which contain material in conformity with the contract and specifications, that is “75% or more sand,” we would appreciate. your designating their location.
(4) For your information, we completed on May 22nd, the construction of the landside enlargement from station 1990 northward, and we are ready to proceed with the construction of the landside enlargement between station 2065 and station 2190.
(5) In view of all of the above, we would respectfully request your further advice and instructions on the subject matter.
On May 29 1931, the contracting officer replied to this, stating that: “Your letter is in error in stating that the contract and specifications require that the material for the enlargement in question contain 75% or more sand.”
•The contractor wired the contracting officer-June 1, 1931, that he did not concur in this decision but that if satisfactory he would proceed with the stripping without prejudice-to his rights.
On June 2, 1931, the contracting officer wired the contractor as follows:
Betel June first borrow pits you propose on west [north] bank Lake Beulah for lower landside enlargement stations twenty sixty five to twenty one ninety not satisfactory stop borrow pits on west bank Lake-Vermillion originally designated for this section are available.
From this latter decision the contractor appealed to the Chief of Engineers June 8, 1931. The Chief of Engineers denied the appeal June 11, 1931, and ruled as follows:
Your contention that a levee of Class C Section must contain 75^ percent or more of sand is incorrect. A true statement is that if the material does contain 75 percent or more of sand the levee should be of Class C section. The prescribing of Class C Section does not carry with it the requirement of 75 percent or more of sand but guards against 75 percent or more of sand being used in the smaller sections.
*202 . You must use the pits designated by the contracting officer or you must protect the United States against unsuitable material at your own.expense in case pits are selected by you.
On June 12, 1931, the contractor agreed with the contracting officer to strip Borrow Pit 4-C at his own expense. The contractor thereafter stripped Borrow Pit .4-0 of 627,684 cubic yards of unsuitable material and deposited the material thereby exposed, consisting of sand, in-the fill of the lower landside enlargement, by the hydraulic process.
For the 626,684 cubic yards of material so stripped the contractor has not been paid, From strata thereunder the -contractor pumped to the lower landside enlargement 412,-942 cubic yards, which was accepted and paid for as fill, 15,572 cubic yards which was accepted and paid for as “false berm” pr extra material, and 32,186 cubic yards, which was wasted and not paid for, a total of 460,700 cubio yards. •
28. Had the Government placed no restriction ;on the length of settling basins, the contractor would have had to use at least three, one' for the upper landside enlargement, one for the riverside, and one for the lower landside. • The ■Government placed no restriction on the length of settling basin in the lower landside enlargement.
. The settling basins .required by the Government, in excess of these, three, were seven in number, necessitating five extra -crossdikes.and seven extra spillways.
The approximate cost of erection, maintenance, and demolition of the seven spillways was $3,636.20.' The approximate cost of erection of the five crossdikes was $466.50, •consisting of 4,665 cubic yards of material.
■ 29. The entire contract work was completed by the plaintiff December 8, 1931, representing a delay in completion of 255 days, for which the defendant withheld from the contract price $2,550. The delay of 255 days was due to the failure of the plaintiff to prosecute the work- with due diligence and is not attributable to any act or acts of the defendant. The propriety of the deduction of liquidated damages was not passed upon by the contracting officer, but was by him left to defendant’s accounting officer.
*203 30. The claims made in paragraphs XV, XYI, and XVII •of the petition, with respect to increased length of pipe line, are abandoned by the plaintiff.
OPINION
Green, Judge,
delivered the opinion of the court, March 17, 1938, as follows:*
■ The plaintiff entered into a contract with the defendant for dredging, transporting, and placing material to be used in the construction of an' addition to a levee along the Mississippi Elver. The price of the work per cubic yard placed was fixed at 35.47 cents and the contract estimate of its amount was approximately $851,280. Excluding the claims which have now been abandoned under the allegations of the petition, the plaintiff seeks to recover approximately $1,022,958.64 for additional work and expense alleged to have been wrongfully caused or required by the defendant in the course of the operations under the contract together with $2,550 deducted as liquidated damages for delay. Included in the recovery asked is an alternative claim for work alleged to have been performed under the contract and not paid for.
As the parties do not agree upon the construction of the contract or upon the facts shown by the evidence,- it becomes necessary to first construe the contract and then determine what has been proved or disproved by the testimony.
The plaintiff claims that the contract was one for dredging work; the defendants insists it was for levee work. The contract provided in substance that the material should be moved by a hydraulic dredge, but it was well understood that the fill which was to be made with the materials moved was to constitute the base of the addition to a levee, except where the material was used to fill old borrow pits pursuant to the contract. We think that neither party is entirely right with reference to the construction of the contract.
The contract is not as clear as it might have been made and we find it necessary to construe its provisions in the light of all of the circumstances in the case.
*204 The specifications attached to the contract provided that—
Alternate bids will be received for placing * * * the required yardage hydraulically in any approved manner."
The contracting officer and counsel for defendant construe the words “in any approved manner” to mean in' a. manner approved by the contracting officer, but we think it clear that so far as these words taken alone are concerned they cannot be so construed. It is not so stated in the words quoted and they would not be so understood as applied to engineering work. The words “approved manner,” when used without other limiting expressions with reference to the performance of the work, we think mean “sanctioned” or “endorsed” generally by those skilled in the business or occupation which is exercised in the performance of the work. This approval need not be unanimous as there is often a difference of opinion in such matters even among-those most skilled. In such cases, however, if the practice used is sanctioned by a decided majority or by those shown to be best informed and skilled in the work it becomes established as the “approved method.”
Counsel for defendant in further support of the argument that the approval of the Government engineer was required quotes the following from specification 22 of the contract, which provides—
In the event that the contractor proposes to do the work by hydraulic methods, his plan of operation shall be sübmitted to the contracting officer for approval.
We think that this provision of the contract was abandoned or waived. A plan of operations could not be furnished by the contractor until he received the necessary construction notes and was assigned a borrow pit or pits' from which he was to dredge for the fill. No attention seems to have been-paid by either jiarty to this provision. No plan was furnished by plaintiff nor was any requested by defendant. The reason appears to be that the work was begun long before complete construction notes necessary for preparing a plan were furnished by defendant and some of the work was begun before any construction notes were *205 available. In fact, defendant advised plaintiff that toe distances could not be given until plaintiff had started pumping and defendant had an opportunity to determine the class of material to be placed in the fill, and further that defendant could not furnish more than 500 feet of construction notes [at one time] which was too short for practical purposes and insufficient for the preparation of a plan of operations. The contracting officer, however, claimed the absolute right to pass finally upon the method, used by plaintiff in placing the material and considered that when he determined it was “not proper” this ended the matter. In this respect he erred, but this holding will be found not material to the decision of the case as we proceed with its further consideration.
There is another provision of the contract which defendant claims was violated by plaintiff and was one of the reasons given by defendant for requiring plaintiff to remove a large quantity of material which plaintiff claims had been properly placed in accoi'dance with the contract. Section 22 of the specifications of the contract provides—
No earth showing a tendency to slough shall be placed in the embankment.
The meaning of the word “slough” as given in the dictionary [except where used as a medical term] is to shed or cast off. As thus used it refers to a separation of material. We are unable to apply the clause of the contract quoted above to the conditions under which hydraulic work must necessarily be carried on. The material had to be pumped and it could only be pumped when in a semi-fluid condition, and when discharged it would not only separate but actually flow. Its condition when discharged at the end of the suction pipe was such that this provision could have no application thereto. If tins clause has any application, it must refer to the material which had settled and been deposited, but here another difficulty is encountered. What kind of an appearance would be presented by material “showing a tendency to slough” is not disclosed by the testimony. Our detennination of other provisions of the contract considered later on is, however, such that a construction of this provision is of no importance.
*206 The contract was not only for moving material but for placing it by hydraulic methods. Moreover, it was stated therein that the earth to be moved was to be used as an embankment for the construction of an addition to a levee. Placing the material in an approved hydraulic manner did not end with its discharge from the suction pipe. It is true that a hydraulic dredge draws into its pipe the material just as it comes. The material to a certain extent is disintegrated and ■ segregated into its component parts by reason of the action of the cutters in. the borrow pits and the agitation caused-by pumping. (See Finding 14.)- This agitation cannot be controlled but the evidence shows that as the material is discharged it is possible to substantially control the placing of it so that the suitable, material will be deposited in the fill and the unsuitable material for the most part flow off. Such being the case, we think the contract required that when the material was distributed after it emerged from the discharge pipe it should be so placed by means of settling basins and. control of the flowage that any considerable quantity of unsuitable material would not be deposited-in one place when intended to be used as part of the base of an enlargement of the levee.
Defendant’s counsel call attention to. specification 39.1 wherein it is provided:
* * * in no case shall pockets of water be permitted to remain between the center line of the levee and the outer limits of the hydraulic fill.
.This provision had no reference to so-called “ponding” in the settling basins but applied to the finished work after the fill had been made complete.
We have set out our construction of the disputed provisions of the contract in order that they might be applied to the facts established by the evidence. When the plaintiff’s case is analyzed, however, it will be seen that the application of the rulings made above is considerably re-restricted. The reason for this is that there is no substantial controversy as to the nature of the material which plaintiff placed in the fills forming part of the levee. ,'A portion of it, which defendant required plaintiff to .remove *207 as unsatisfactory, is shown to have been unfit for levee purposes by the evidence as a whole. (See Finding 25.)' The remainder complied with the contract and was accepted and paid for. The controversy for the most part arises as to whether the restrictions placed by defendant on the flow of material as it came from the discharge pipe caused unnecessary wastage and were arbitrary. In other words, the controversy so far is not whether plaintiff deposited unsuitable material in the fills, but whether defendant, by its requirements and restrictions, caused large quantities of material to be unnecessarily and unreasonably wasted so that plaintiff is entitled to recover therefor as if this material so wasted had been placed in the fills.
The evidence with reference to the alleged wastage of material is extremely indefinite and conflicting. It establishes nothing except, as we have before stated, that the deposit of material in the fills may be largely controlled by the use of settling basins, spillways, baffleboards, etc. The material which came from the discharge pipe was mixed with water in such a condition that it would flow to a greater or less extent and separate from the water • as it flowed.' It is a matter of common knowledge that the heavier material in this mixture will first be precipitated; then the next in weight;. and last what has been referred to in the testimony as “fines,” that is, fine material consisting mostly of silt. The parties agree that silt in considerable quantities by itself is not suitable for levee purposes and it is evident that there would be more or less wastage if methods were used to prevent an undue accumulation of unsuitable material. The parties dispute as to the number of settling basins which should be used and not only as to the number of baffleboards and spillways but as to the effect thereof. The plaintiff wished to have them so arranged that as much material as possible would be deposited. The result would have been that nearly all' the material which, was pumped would' go into the fills and this would have placed in the fill considerable quantities of unsuitable material. The defendant, through its contracting officer, insisted in some instances on restricting the length of the settling basins to 2,000 feet and also required that the baffleboards should not *208 be used in sucli a manner as to prevent the continuous flow of water. In some instances, this method resulted in over half of the material pumped being wasted. This would seem to be unnecessary, but how much would be wasted when proper methods were used to prevent unsuitable material being deposited, we cannot determine. Finding 15 shows that when pumping from a certain pit if one long settling basin Avere used, as plaintiff desired, only 15% would be wasted, but plaintiff’s method, as we have stated above, would have resulted in considerable quantities of unsuitable material being deposited in the fill. We are unable to determine just how much would have been Avasted if a proper method, or an “approved” method had been used, for the reason that the evidence fails to disclose any approved method of controlling the placing of the material by settling basins, baffleboards, etc. There is nothing to show any rule or established practice in this matter and it is difficult to see how there could be for the method would be different with the different kinds of material pumped. Plaintiff itself used settling basins shorter than 2,000 feet when pumping material composed largely of sand.
The lack of evidence on this point, however, does not relieve the plaintiff of responsibility if defective material was in fact placed in the levee‘fills for reasons above stated and others that will be hereinafter given.
Tailing up next, in their order, the several claims made by plaintiff in its petition, we find that the first claim [paragraph VI of the petition] is for 188,722 cubic yards of material moved on orders received from the contracting officer from the landside toe of the new levee prism to the old borrow pits. Claim- 2 [paragraph VII of the petition] • goes with No. 1, as it has the same facts as a basis and is for 30,000 cubic yards of material furnished by plaintiff from borrow pit A designated by defendant and which, under defendant’s orders, Avas removed from the landside toe of the new levee prism to old borrow pits. This material was suitable but had been deposited above the material described in claim 1 and consequently had to be removed if the material referred to in No. 1 was taken out.
*209 In this connection the plaintiff claims that the contract contains a direct provision'that..it-should be paid for the removal of waste material. The provision upon which it relies is set out in paragraph 24 of the specifications and is as follows:
Disposition of objectionable material. — When the borrow pits, or the ground to be occupied by the levee, contain soil which is unfit to be put into or remain under the levee, the contractor will be required to remove the same and dispose of it as directed by the contracting officer. If such material removed from the ground is wasted, the contractor will be paid for it at the contract price per cubic yard.
We think it obvious that this provision pertains only to material in the borrow pits and the ground to be occupied by the levee. In many cases the suitable material in the borrow pits was overlaid with material unfit to be put in the levee. In this event, of course, it was necessary for it to be removed before pumping the suitable material out of the borow pits. For the removal of material so wasted the plaintiff was to be paid but this provision has no application to unsuitable or defective matter which was placed in the fill forming part of the levee.
Defendant’s engineers advised plaintiff that this material was unsatisfactory and ordered its removal. “Unsatisfactory” is not necessarily the same as unsuitable. We do not need, however, to decide whether their action determined the matter, for the evidence pertaining to this particular deposit shows it to be of defective material. (See Finding 25.) Indeed, this is scarcely disputed on the part of the plaintiff. The evidence makes it plain that it was easily distinguishable from the suitable material which plaintiff had placed above. Plaintiff seems to contend that the contract only required that it should pump the material from designated borrow pits and if, when it was discharged, defective material was placed in the fill, it was not responsible. This, we have shown above, is an error, for its responsibility did not end when the material came out of the *210 discharge pipe. Moreover, this is definitely settled by another provision of the contract. Article VI provides:
The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the same from the premises.
The Government had the right under this provision to have the situation corrected and the necessary work done for such purpose and was not required to pay for the placing of this material in the fill, nor on account of its removal, unless some liability was incurred by reason of the material being used to fill the old borrow pits, a matter which will be considered later; or, unless the deposit of defective material came into existence because of unreasonable and •unnecessary requirements made by defendant.
Having found that the material was in fact defective,
claims 1- and 2 must be rejected for the reasons above stated, regardless of whether the method prescribed by defendant would have prevented the deposit of defective material or whether this method would have unnecessarily restricted the deposit of proper material, and we do not pass on these questions.-
Claim 3 [paragraph VIII of the petition] is based on an alleged unnecessary wastage of material pumped from pit A by reason of defendants restrictions on the length of the .settling basins to 2,000 feet, and on the use of baffleboards.
Pit A was a buckshot pit in which there was a union of fine sand, silt, and clay. In.its natural state it was satisfactory levee.material bound together by the clay, but when mixed with water and. drawn through the suction pipe it was disintegrated and a large.amount of unsuitable material Which, as it ..lay in the pit had been bound in with more solid.matter, became separated and unfit for use in the construction of the levee. If the material deposited was restricted to that which was suitable, a large amount of wastage occurred (see Finding 14). This is practically conceded by plaintiff but it insists that the defendant’s require *211 ments as to settling basins, baffleboards, etc., caused an excess wastage of 189,985 cubic yards which, was entirely unnecessary. It may be, as we are inclined to think, that the restrictions and requirements made by defendant were excessive but the evidence does not show the amount of wastage which would have occurred if proper methods had been used — that is, methods which would have prevented the deposit of any considerable quantity of unsuitable material. Finding 14 shows the difficulty which arose when buckshot was pumped and while the evidence in some respects is indefinite it does show, as we think, that a large amount of waste was unavoidable in properly placing this material.' On this point the evidence is conflicting, in some respects on both sides we think unreasonable, and from it we are unable to make even an approximation as to the proper amount. This claim must therefore be rejected.
Claim 4 [paragraph IX of the petition] is based in part on the failure to designate additional borrow pits and defendant’s order to begin placing- the materials without retaining levees. We think this claim and claim 5 [paragraph X of the petition] are not proved except as they are merged in claim 6 which will next be considered.
Claim 6 [paragraph X% of the petition] is for filling old borrow pits on the riverside of the levee and is advanced as an alternative to claims 4 and 5, as the wastage claimed in 4 and 5 flowed into the old riverside borrow-pits. This claim depends on the construction of the contract, or to state it more definitely, on the construction of a requirement placed in a sketch attached to the contract which will next be considered. The contract included specifications for levee work which were amplified by drawings and sketches attached thereto and made a part thereof, and the work was required to be strictly in accordance with the specifications and drawings. The contract drawing had a heavy green line as an insignia for the “riverside” work and also a note as follows: “Biverside enlargement to be preceded by hydraulic fill of present pits.” A large portion of the material pumped from pits C and D was wasted. Plaintiff claims that this -waste occurred by reason of the restrictions *212 on the settling basins and removal of the baffleboards under the unreasonable and improper requirements made by the defendant. But there would have been a large amount of waste in any event if only proper materials were permitted to be deposited in the fill. How much this waste would be, we do not find it necessary to determine because the wastage overflowed into the old borrow pits on the riverside of the levee and plaintiff under the contract would be entitled to recover to the extent that these borrow pits were filled thereby. It is argued on behalf of defendant that the provision of the contract last above quoted was intended to apply only in case a dry fill was made and hydraulic methods not used. But there is nothing in the evidence which would support this construction. On the contrary it would seem that there may have been no occasion for this provision if the dry fill method had been used, or at least no more occasion for it. It would seem reasonable that the defendant would not want borrow pits of a size capable of holding such a large amount of material to remain empty on the riverside and adjacent or near the toe of the enlargement of the levee and that the stability of the levee would be increased when these pits were filled with earth. The borrow pits, if empty, would be filled with water when the river was at a high stage. But we do not base our conclusion on what has just been stated and it is not necessary that we should do so for the contract is quite plain in 'this respect — indeed much plainer than it is with reference to most of the matters in controversy. We think the plaintiff was required to fill the borrow pits on the riverside and if we are correct in this it was entitled to pay for the material that went into them.
It is also contended on behalf of defendant that the yardage for which it was to pay is limited by the estimates contained in the specifications plus 20%, but in Article 1 of the contract the words “more or less” follow directly after the figures stating the yardage to be moved and placed. Moreover, we think that taking the contract as a whole it was intended that the plaintiff should be paid for all work done under it. It is also said that a letter from *213 plaintiff showed it understood that it was not to be paid for material extending beyond the toe of the levee. But in the letter plaintiff was writing about the landside enlargement, and we do not think defendant would be willing to have the remainder of the contract construed according to plaintiff’s understanding of it. Elsewhere the defendant is insisting that the contract be constructed strictly against plaintiff.
Another provision of the contract cited on behalf of defendant plainly applies only to cost of clearing, sodding, etc., and has no application here.
This makes it necessary to determine how much material was thus disposed of. From pit C the plaintiff dredged 1,170,805 cubic yards but the Government accepted only 237,774 cubic yards in the fill and 111,562 yards as “false berm.” The remainder, amounting to 821,469 cubic yards, overflowed into the old borrow .pits outside of the levee enlargement and false berm. Here no claim can be made that the material was defective for the purposes for which it was used.
From pit D the contractor pumped 493,256 cubic, yards of material for the riverside enlargement. Of this quantity the Government accepted 137,014 cubic yards in the fill and 5,151 cubic yards outside the prescribed limits of the fill as “false berm.” The remainder, 351,091 cubic yards, went into the old borrow pits and was not paid for by the Government. No spillways were used on this lift and the work proceeded in this manner by common consent. A “false berm” is an additional shoulder of material placed alongside a levee to give it additional stability and foundation and the Government paid for what went into the false berms on the ground that the levee was benefited thereby. The total amount placed in the old borrow pits on the riverside of the levee and not paid for was 1,172,560 cubic yards, which at the contract price amounts to *$415,907.03, which plaintiff is entitled to recover.
Claim 7 [paragraph XI of the petition] is for 44,444 cubic yards of effluent materials which went through the spillway and were deposited on the foundations of the en *214 largement below station 1935. Plaintiff concedes that it was necessary-to remove the deposit as .not being suitable for foundation purposes but claims that it was caused by the defendant’s interference with the length of basins, height of spillways, and erection of dikes. Here again the evidence is conflicting. No definite conclusion can be derived from it except that the claim is not supported by a preponderance of the evidence.
Claims 8 and 9 [paragraphs XII and XIII of the petition] are in the same situation. We are unable to determine from the evidence just how many settling basins would be required for doing the work in approved hydraulic manner and consequently unable to determine whether the defendant’s engineer acted arbitrarily in requiring additional spillways and additional dikes or, if he ordered more than were necessary, what the proper number would have been,'
Claim 10 [paragraph XIY of the petition] is for the removal of waste material from “new” borrow pit. This was done under a separate agreement made by the plaintiff that if the particular borrow pit which it wanted was designated it would remove the waste material free of cost. Plaintiff claims that this agreement was made under duress, but the evidence fails to show the necessary elements to constitute duress and the claim must be denied.
Claims 11, 12, and 13 [paragraphs XY, XYI, and XVII of the petition] have been abandoned.
Claim 14 [paragraph XVIII of the petition] for expense of delay caused by failure to make timely designation of borrow pits is not sustained by the evidence.
Claim 15 [paragraph XIX of the petition] for liquidated damages deducted in making payment is also denied as we have found that the delay was the fault of plaintiff.
In accordance with what has been said above, judgment will be rendered for the plaintiff in the sum of *$415,907.03.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Booth, Chief Justice, concur.

 (Note. — See 86 C. Cls. 404.)

(See order, ante, p. 171.)

(See order, ante, p. 171.)